[Civ. No. 1900.   Fourth Appellate District.—June 23, 1938.]

CHARLES C. MOORE et al., Respondents, v. FREDERICK E. HOAR et al., Defendants; JOE SMITH, as Executor, etc., et al., Appellants.

John W. Preston and Claflin, Dorsey & Campbell for Appellants.

Siemon & Claflin, Borton, Petrini & Conron and C. W. Hobson for Respondents.

THE COURT.—The following opinion was prepared by the late Mr. Justice Jennings and is adopted and published as the opinion of this court.

The appeal herein has been taken by the defendants Joe Smith as executor of the will of Gus Colberg, deceased, Mary A. O'Donnell, and Joe Smith individually from the portion of the judgment entered in this action which decreed that these defendants have no valid right or interest in a group of five mining claims located in the Mojave Mining District of Kern County. The controversy which gave rise to the appeal was between the above-mentioned defendants and certain other defendants who will hereafter, for the sake of brevity, be designated "The Townsend Group". Both groups of defendants, admitting that plaintiffs are the rightful owners of an undivided half interest in said mining claims, set up conflicting claims to the remaining undivided half interest in the property. The trial court determined that the claim asserted by the Townsend group was entitled to prevail and by its judgment so decreed. The present appeal was thereupon perfected. Certain undisputed facts which form the background against which the controversy between the rival groups of defendants is projected may properly be stated.

At some time prior to September 23, 1925, Gus Colberg and C. C. Moore were jointly in possession of the aforesaid unpatented mining claims. On the above-mentioned date C. C. Moore, as attorney in fact for Colberg, executed a quitclaim deed conveying the five claims to C. L. Moore

"trustee". C. L. Moore is the son of C. C. Moore. The deed contains no reference to any trust, and so far as appears on its face constituted an absolute conveyance of whatever right, title, or interest Colberg had in the property. However, C. L. Moore testified that the deed was made for the purpose of facilitating the obtaining of a patent to the claims from the U. S. Government and that he held the record title for his father and Colberg without any claim of ownership in himself. On February 14, 1927, C. L. Moore as trustee executed a deed whereby he reconveyed to Gus Colberg all estate and interest in the five claims which he had acquired by the former deed. On February 23, 1927, a quitclaim deed was executed by C. C. Moore and wife and by C. C. Moore as attorney in fact of Gus Colberg conveying the property to C. L. Moore. This instrument was absolute on its face. On May 28, 1928, a written agreement respecting the five claims was entered into between Gus Colberg, as party of the first part, C. L. Moore and wife, as parties of the second part, and C. C. Moore and wife as parties of the third part. This instrument has very considerable importance in the controversy between the two groups of claimants and will hereafter receive more detailed attention. On August 8, 1929, Gus Colberg executed a written instrument which may at this time be termed an assignment. Frederick E. Hoar was named therein as assignee. This instrument likewise has much importance in the controversy and will hereafter be considered. It may be remarked in passing that the Townsend group of defendants derived whatever right and interest they have in the property from the two last-mentioned instruments. On July 30, 1930, Gus Colberg made his will wherein he designated Dr. Joe Smith and Mary A. O'Donnell as sole beneficiaries and appointed the former to be executor of the will. This testamentary instrument is the source of whatever claim the defendants Smith and O'Donnell have in the property. Gus Colberg died on October 3, 1930. In the month of November, 1931, patents were granted by the United States which covered four of the five mining claims to which reference has heretofore been made. Charles L. Moore was named in these documents as patentee or grantee of the property. During the month of April, 1934, various assignments and deeds were executed, the effect of which was to convey to the Townsend group of defendants

whatever right, title, and interest in the mining property Frederick E. Hoar obtained through the instrument of August 8, 1929, heretofore termed an assignment. Letters testamentary in the estate of Gus Colberg, deceased, appointing Joe Smith as executor of Colberg's will issued on December 20, 1934.

The agreement of May 28, 1928, recites that whereas C. L. Moore holds the record title to the five mining claims which all parties to the agreement acknowledge is held by him as trustee for the sole purpose of procuring a patent and that the equitable title in said claims is in Colberg as to an undivided half interest and in C. C. Moore and wife as to the remaining half interest and that it is the desire of the parties to the instrument to agree upon their respective interests in the property and to provide for proper distribution of whatever consideration may be received from a sale of the claims and to provide for securing a patent if possible, and whereas C. C. Moore claims that he has made advancements in connection with patent proceedings and is willing to make further advancements for the same purpose. Subject to provisions for repayment set out in the instrument the parties make certain covenants and agreements. The two first paragraphs of that part of the instrument which contains the covenants of the parties provide, first, that C. L. Moore in performing any service under the agreement is acting as trustee for Colberg and C. C. Moore without compensation; second, that C. L. Moore will proceed immediately and with all possible diligence to secure the issuance of a patent to the claims. It is then next provided that C. C. Moore will advance all proper costs and expenses which may be required to be expended in connection with procuring a patent and upon issuance of the patent will tender to Colberg an itemized statement of such costs and expenses. A detailed description of a plan for determining the propriety of expenses claimed to have been incurred in connection with obtaining the patent then follows. It is next provided that upon issuance of a patent the parties shall diligently endeavor to negotiate a sale of the property at a price agreeable to them and it is expressly stipulated that the patentee as trustee shall not alienate or encumber the title to the property unless both Colberg and C. C. Moore shall authorize the sale or

encumbrance or alienation. The two provisions immediately following state that from the proceeds derived from a sale of all or any part of the claims there shall first be deducted and repaid to C. C. Moore all expenditures made by him in connection with obtaining a patent and the remainder shall be divided equally between Colberg and C. C. Moore. It is then stipulated that either of the parties to the agreement who shall secure a purchaser of the property shall be deemed to have done so for the joint benefit of all parties and shall not be entitled to receive any compensation for his services and that the trustee upon demand shall divulge to Colberg and C. C. Moore the name of any actual or prospective purchaser and the amount offered or received for the property. It is then expressly provided that at any time subsequent to the obtaining of a patent Colberg shall be entitled to a deed conveying to him an undivided one-half interest in the property upon payment by him of one-half of the expenses paid out in procuring the patent. It is next agreed that if it should become necessary to perform assessment work on the claims for the current year because of an expressed possible delay in connection with the patent proceedings, the amount required to be expended for doing such work shall be paid and deducted in the same manner provided for the payment of expenses incurred in procuring a patent. The final provision of the agreement deals with the possibility of the attempt to secure a patent being unsuccessful. It is there expressly stipulated that in such event Colberg shall not be chargeable with any expenses incurred or expended and that such charges and expenses shall not constitute a lien on his equitable one-half interest in the property.

The written instrument executed by Colberg on August 8, 1929, is in the following language: "For value received, I hereby assign, transfer and set over unto Frederick E. Hoar, all of my right, title and interest in and to the agreement dated May 28, 1928, by and between Gus Colberg, first party, C. L. Moore and Marie Moore, husband and wife, second parties, and C. C. Moore and N. F. Moore, third parties, said agreement relating to those certain mining claims situate in the Mojave Mining District, Kern County, California, known and designated as Grand Prize, Ben Hur, Sailor Girl, Sailor Boy, and Silver Coin."

This instrument was acknowledged by Colberg on the date of its execution and was recorded at the request of Hoar on December 10, 1931.

An inspection of the findings made by the trial court discloses that the court construed the last-mentioned instrument as an assignment and sale by Colberg, for good and sufficient consideration, of all rights which he had under the agreement of May 28, 1928, and as a conveyance by Colberg to Hoar of all of the former's right, title and interest in the property. It is also evident from an examination of the findings that the court construed the agreement of May 28, 1928, as a written agreement made for the purpose of defining the rights and obligations of the parties relating to the mining claims, that the reason for its execution arose from the conveyance made to C. L. Moore on February 23, 1927, and that the agreement substantially expressed the rights and obligations of the parties with reference to the claims as such rights and obligations had previously existed in parol. The construction thus placed upon the two instruments by the trial court furnishes the basis for the numerous contentions advanced by appellants on this appeal.

It is first urged that the instrument of August 8, 1929, shows on its face that it was nothing more than an assignment of the agreement of May 28, 1928, and that Colberg did not intend thereby to convey to Hoar any interest in the mining claims. Closely associated with this contention is another which relates to the written agreement of May 28, 1928. It is said that the undisputed evidence shows that prior to the execution of the last-mentioned agreement, Colberg was the equitable owner of an undivided half interest in the property, the bare legal title being in C. L. Moore as trustee for the sole purpose of facilitating the procurement of a patent, that the written agreement gave him nothing which he did not already have since it expressly recognizes his equitable ownership of a half interest in the property and shows on its face that the only reason for its execution was to enable the trustee, C. L. Moore, to obtain a patent which he would then hold as trustee for Colberg and C. C. Moore, the real owners of the property. The next step in the line of reasoning presented by appellants in this connection is that since the agreement of May 28, 1928, did not confer any title upon Colberg or give him any right

or interest in the property which he did not theretofore have, the assignment by Colberg of "all my right, title and interest in and to the agreement dated May 28, 1928", could not operate as a transfer or conveyance of any right or title or interest in the property, particularly since it was by its very terms limited to an assignment of the writing alone. The conclusion attained by this argument is that Hoar took nothing by the assignment and that respondents as his successors are in the same position and are consequently entitled to no right or interest in the claims.

In giving consideration to the argument thus advanced it may be well to examine first the agreement of May 28, 1928. In so doing the condition of the record title to the mining claims may properly be noted. As heretofore observed an instrument affecting the legal title to the five mining claims was executed by C. C. Moore and wife and by C. C. Moore as attorney in fact for Gus Colberg on February 23, 1927. This instrument recites that Gus Colberg, a single man, and C. C. Moore and N. F. Moore, husband and wife, as parties of the first part "have remised, released and forever quitclaimed, and by these presents do remise, release and forever quitclaim, unto the said party of the second part", who is stated in the preamble of the document to be C. L. Moore, "and to —— heirs and assigns, all those certain lots, pieces, or parcels of land, situate, lying and being in the Mojave Mining District, County of Kern, State of California, and bounded and particularly described as follows, to wit: The Sailor Boy Mining Claim, Ben Hur Mining Claim, Grand Prize Mining Claim, Silver Coin Mining Claim and Sailor Girl Mining Claim". This instrument was undoubtedly a quitclaim deed (*Lawrence* v. *Ballou,* 37 Cal. 518; *Rego* v. *Van Pelt,* 65 Cal. 254 [3 Pac. 867] ; *Wholey* v. *Cavanaugh,* 88 Cal. 132 [25 Pac. 1112]) and operated to convey whatever title or interest in the land the grantors had. (*Wholey* v. *Cavanaugh, supra; Taylor* v. *Opperman,* 79 Cal. 468 [21 Pac. 869] ; *Myers* v. *City of Oceanside,* 7 Cal. App. 87, 93 [93 Pac. 686] ; *Towne* v. *City of Los Angeles,* 4 Cal. App. (2d) 418, 420 [41 Pac. (2d) 363].) So far as the record indicates this deed was the last instrument which in any way affected the title to the mining claims that appeared of record prior to the execution of the agreement of May 28, 1928. The instrument is absolute on its face and con-

tains no language which purports to limit or qualify the title conveyed. On May 28, 1928, therefore, whatever right, title, or interest C. C. Moore and Gus Colberg owned in the property had been transferred by them and stood in the name of C. L. Moore. Appellants do not question the effect of the deed. ■ The transcript shows, however, that when the deed was offered in evidence they objected to its admission and they now complain of its reception on the ground that no authorization by Colberg to C. C. Moore to execute the deed as the former's attorney in fact was proved and it is therefore contended that the document was erroneously admitted. However, the record shows that appellants themselves offered a deed executed on September 23, 1925, which was likewise a quitclaim deed executed by C. C. Moore as attorney in fact for Gus Colberg conveying title to the five claims to C. L. Moore, trustee. It also appears that on February 14, 1927, C. L. Moore, as trustee, executed a deed reconveying to Gus Colberg all estate and interest in the mining claims which the former had derived by the deed of September 23, 1925. Objection was interposed to the admission of the last-mentioned deed by appellants and it was received over their objection. No point is, however, made of the admission of the deed of reconveyance on this appeal and no reason is apparent for declaring that the trial court erred in receiving it.

Having in mind the condition in which the title stood after the execution of the deed of September 23, 1925, and the deed of reconveyance of February 14, 1927, we entertain the opinion that no error was committed in admitting the deed of February 23, 1927. Appellants have made it abundantly clear that they place much reliance on the deed of September 23, 1925, and that they consider it the one instrument of the three discussed affecting the title to the property which was properly admitted. The reason for their expressed opinion in this matter is apparent. This instrument purported to convey title to C. L. Moore "Trustee". The use of the word "Trustee", they contend, corroborates the testimony of C. L. Moore, who testified positively that the property was conveyed to him by the deed of September 23, 1925, for the purpose of facilitating the issuance of a patent, that the owners of the property were C. C. Moore and Gus Colberg, that the witness made no claim of owner-

ship in the property, and that there was no change in the purpose for which he held the record title at any time up to and including the date when patents were finally issued.

The argument thus made is proper so far as it goes but it has no efficacy other than furnishing support for the introduction of the deed of September 23, 1925, which was received without objection and which requires no support. The testimony of C. L. Moore to the effect that this deed conveyed record title to him as trustee for C. C. Moore and Colberg for the stated purpose stands uncontradicted. However, this action is one in which the record title is a matter of some importance. In tracing the chain of title all instruments affecting the record title are material and competent. The deed executed by C. L. Moore on February 14, 1927, which expressly reconveyed to Colberg all estate and interest in the property which had been derived under the former deed of September 23, 1925, was certainly competent in an investigation of the record title since it purported to convey ''all the estate and interest derived to said party of the first part (C. L. Moore) by or through that certain deed dated September 23, 1925 . . . in the mining claims therein described'' naming the five claims. The effect of this deed was to place the record title to the entire property in Colberg.

The deed of February 23, 1927, was properly admitted. The agreement of May 28, 1928, which is manifestly important since out of it arose whatever right or interest the respondents acquired, makes reference to it in the following language: ''Whereas, C. L. Moore and the other parties hereto admit and acknowledge that said C. L. Moore holds the record title of said claims as a trustee for the purpose of procuring patent only, and that the equitable title in and to said claims stands an undivided one-half interest in the first party, and an undivided one-half interest in the third parties, the said record title having been acquired by second party C. L. Moore by reason of conveyance from third party C. C. Moore acting under and by virtue of power of attorney granted by Gus Colberg, and C. C. Moore and N. F. Moore as individuals . . . ''

The language ''the said record title having been acquired by second party C. L. Moore by reason of conveyance from third party C. C. Moore acting under and by virtue of power

of attorney granted by Gus Colberg, and C. C. Moore and N. F. Moore as individuals'' fully answers the suggestion of appellants that it was the deed of September 23, 1925, to which the agreement referred. The earlier deed was executed by C. C. Moore as attorney in fact for Gus Colberg. The name of N. F. Moore does not appear at any place in this instrument and it was not executed by her. The later deed contains her name in the opening paragraph and the instrument shows on its face that it was signed and acknowledged by her. Appellants suggest that there is no showing that Colberg knew of the existence of the later deed whereas it appears from C. L. Moore's testimony that he did know of the earlier deed, hence it is argued that the agreement of May 28, 1928, must have referred to the earlier deed and the trial court erred in determining otherwise. On the contrary, since it is obvious that the quoted language refers to the later deed and to it alone the trial court was entitled to assume that Colberg, who signed the agreement, was familiar with its contents and fully understood that it was the later and not the earlier deed to which reference was made.

The contention of appellants that the deed of February 23, 1927, was improperly admitted because no showing was made that Colberg had given C. C. Moore authority in writing to execute such an instrument is based on the familiar principle that the authority of an agent to enter into a contract, required by law to be in writing, can only be given by an instrument in writing. It is so declared in section 2309 of the Civil Code. Section 1091 of the same code is more explicit and more to the point in the present instance. It is there provided that an estate in real property, other than an estate at will or for a term, not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, ''or by his agents thereunto authorized by writing''. The deed under discussion purported to convey ''all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity'' of the grantors ''in or to the said premises, and every part and parcel thereof, with the appurtenances'' to the grantee ''and to —— heirs and assigns forever''. The estate thereby conveyed was therefore of the character which by statutory enact-

ment could only be transferred by an instrument in writing subscribed by the party disposing of the same or by his agent authorized so to do by written instrument. However, it is expressly provided in section 2307 of the Civil Code that an authority may be conferred either by precedent authorization or by subsequent ratification. Section 2310 of the same code qualifies the very general language of section 2307 and makes it clear that ratification of an agent's act can be accomplished only in the manner that would have been necessary to confer an original authority to perform the act ratified. Since original authority to execute the deed of February 23, 1927, for Colberg could only have been conferred by written instrument it follows that if ratification rather than precedent authorization is relied upon to establish the authority of C. C. Moore to execute the deed in Colberg's name such ratification must have been made in writing. The record is barren of any showing that C. C. Moore was originally authorized in writing to execute the deed in question for Colberg. It remains to discover whether or not the record discloses the presence of evidence sufficient to establish the necessary fact of subsequent ratification in the manner required by the plain language of the statute.

Such ratification is, in our opinion, found in the second paragraph following the preamble of the written agreement of May 28, 1928, which was signed and duly acknowledged by Gus Colberg. It is there stated that C. L. Moore and the other parties to the agreement "admit and acknowledge" that C. L. Moore holds the record title to the claims as trustee for a specified purpose, such record title having been acquired by the trustee through a conveyance executed by C. C. Moore "acting under and by virtue of power of attorney granted by Gus Colberg" and by C. C. Moore and N. F. Moore as individuals. As heretofore pointed out the "conveyance" there mentioned undoubtedly refers to the deed of February 23, 1927. We have then an express admission in writing by Colberg that C. C. Moore in executing this deed did so under authorization granted by Colberg. Such evidence was ample to establish the necessary fact of ratification in writing and justified the admission of the deed over the objection urged by appellants.

We may next proceed to a consideration of the agreement of May 28, 1928, with particular reference to the strenu-

ous contention of appellants that by its terms Colberg acquired no rights or benefits and no title or interest in the mining claims which he did not possess prior to the execution of the agreement and that consequently the assignment by Colberg to Hoar on August 8, 1929, of "all my right, title and interest in and to the agreement dated May 28, 1928", was an idle act. In this connection it is said that the sole purpose of the agreement manifest on its face was to enable C. L. Moore to procure a patent to the claims from the U. S. Government. Such a statement is not strictly accurate for it is evident from a most casual inspection of the document that Colberg and C. C. Moore were desirous of making a sale of the property and that C. L. Moore, who was a party to it, was expressly empowered, under specified limitations, to effect a sale. It is also apparent that, prior to the date of the agreement, C. C. Moore had made some expenditures and that he expressly bound himself to make further advancements of money which would be required to be paid by way of costs and charges incidental to the procuring of a patent. It is also evident that in so doing he did not propose to act gratuitously without expectation of reimbursement as it is made abundantly clear that he should be entitled to have repaid to him one-half of the amount which he might advance and Colberg, after the issuance of a patent, would be entitled to a deed conveying to him an undivided half interest in the property only upon payment by him of one-half of the amount expended by C. C. Moore. The various purposes of the agreement as expressed therein are not, however, of special importance in giving consideration to the claim that Colberg received nothing under the agreement which he did not already have and that therefore giving full effect to the instrument of August 8, 1929, as an assignment the person named therein as assignee took nothing thereby.

The contention of appellants that under the agreement of May 28, 1928, Colberg acquired no title or interest in the property which he did not have at the time the agreement was executed suggests a reference to the state of the title on the date the agreement was made. As heretofore observed a quitclaim deed had been executed by C. C. Moore and wife and by C. C. Moore as Colberg's attorney in fact on February 23, 1927. This instrument was acknowledged by the attorney

in fact on the date of its execution and was placed of record on the following day. So far as appears no other instrument which purported in any way to affect the title to the property was executed from February 23, 1927, until the agreement of May 28, 1928, was made. The deed of February 23, 1927, was absolute on its face. It purported to convey to C. L. Moore the five mining claims "together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversions, remainder and remainders, rents, issues and profits, thereof. And also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said parties of the first part, in or to the said premises, and every part and parcel thereof, with the appurtenances." The deed contains no intimation that the estate conveyed was limited or qualified in any respect. The comprehensive language employed in the instrument indicates an absolute, unqualified transfer of whatever right, title, or interest, both legal and equitable, the grantors had in the property and this was undoubtedly the effect of it. (*Stanway* v. *Rubio,* 51 Cal. 41; *Mowry* v. *Heney,* 86 Cal. 471, 475 [25 Pac. 17]; *Faivre* v. *Daley,* 93 Cal. 664, 669 [29 Pac. 256].) The operative words "remise, release, and forever quitclaim . . . all those certain lots, pieces, or parcels of land, . . . and also all the estate, right, title, interest . . . claim and demand whatsoever, as well in law as in equity . . . in or to the said premises" are the most apt that could have been selected to convey to the grantee both the legal and the equitable interest of the grantors in the five claims. (*MacFarland* v. *Walker,* 40 Cal. App. 508, 511 [181 Pac. 248].) Certainly by this instrument duly executed and recorded Colberg had effectually divested himself of every shred of record title, legal and equitable, which he had in the property and up to the time when the agreement of May 28, 1928, was made he had no record interest or right in the premises. During this period C. L. Moore could have executed a deed which would have conveyed the entire interest transferred to him to an innocent purchaser without notice for value and Colberg's claim that he was in fact the real owner of an undivided half interest in the claims would have been unavailing. Such then was the situation on May 28, 1928, when the agreement was executed. This

latter instrument which was duly acknowledged changed the picture completely, for in it there is an express admission by the only three persons who ever appeared to have any interest in the claims that C. L. Moore, the grantee named in the unqualified deed of February 23, 1927, is not the true owner of the property but that he holds the record title merely as trustee for a designated purpose and that the real, the equitable title, is in Colberg and C. C. Moore. Here then is a written instrument which completely clarifies the situation and which discloses that C. L. Moore who is the record owner of whatever title and interest C. C. Moore and Gus Colberg have in the property is not in fact the true owner but holds the bare legal title as a mere trustee for the true owners who are C. C. Moore and Gus Colberg. When therefore the entire background of the matter is considered with particular reference to the state of the record title it is apparent that the contention of appellants to the effect that Gus Colberg acquired no right or interest in the property by virtue of the agreement which he did not already have and derived no benefit therefrom is specious but unsound. Colberg did in fact derive a very distinct benefit and an interest in the property which he did not possess prior to the execution of the agreement. He had parted with his entire interest, equitable as well as legal, in the claims. So far as the record showed he had no interest, no right, no claim of title of any sort in the property. The agreement being a declaration in writing by the record owner that he was a mere trustee established the true state of the title and furnished most convenient and cogent evidence of that important fact.

Having arrived at the conclusion that Colberg did in fact derive a real benefit and a right, title, and interest in the property by virtue of the terms of the agreement we may next properly proceed to a consideration of the contention of appellants that Frederick E. Hoar acquired no interest in the property by the so-called assignment of August 8, 1929. This contention is based on the peculiar language of the instrument now under consideration. This language is "I hereby assign, transfer and set over unto Frederick E. Hoar, all of my right, title and interest in and to the agreement dated May 28, 1928." The primary argument relative to this phase of the case is that an assignment of right, title and interest "in and to the agreement" is nothing more than

an assignment of the very document to which reference is made and that it did not effect a transfer of any right, title or interest possessed by the assignor in the mining claims. As heretofore observed the trial court made an express finding contrary to the contention of appellants by construing the instrument as an assignment and sale by Colberg of all rights which he had under the agreement of May 28, 1928, and as a conveyance to Hoar of all right, title, and interest which Colberg had in the property.

The construction placed upon the language of the instrument by the trial court was, in our opinion, entirely reasonable and proper. Appellants apparently maintain that the use of the words "in and to the agreement" indicates an intent on the part of the assignor, Colberg, to transfer to the assignee, Hoar, nothing more than physical possession of the document which consisted of several pages of written matter. The argument thus made demanding so strict a construction of the language is not impressive. It is contrary to a cardinal rule of construction which requires the language of a contract to be so interpreted as to make the contract capable of being carried into effect if it can be done without violating the intention of the parties. (Civ. Code, sec. 1643.) The contention of appellants, if upheld, would make the signing and acknowledgment of the instrument utterly useless and meaningless. It would import to Colberg an intention to perform a purely idle act. Moreover, there is certain other language contained in the instrument which is not consistent with so strained a construction as that for which appellants contend. After the agreement is identified by the date of its execution and still further identified by reference to the names of the various parties to it, the following significant language appears: "said agreement relating to those certain mining claims situate in the Mojave Mining District, Kern County, California, known and designated as Grand Prize, Ben Hur, Sailor Girl, Sailor Boy, and Silver Coin." The use of the language last quoted is strongly indicative of an intention to accomplish something more than a mere transfer of a written document which so far as appears could have been more certainly effectuated by handing over the document itself. Finally, the use of the words "assign, transfer and set over" in conjunction with the significant verbiage "all of my right, title and interest in and to the

agreement'' is illuminating on the important question of Colberg's intent in executing the instrument. The words ''assign and transfer'' are words which are usually employed for the purpose of conveying a present interest in property of the character of the agreement to which they are applied in the instrument under consideration. (*Estate of Beffa,* 54 Cal. App. 186 [201 Pac. 616].) The use of the words ''all of my right, title and interest'' is likewise significant. If Colberg intended to do no more than execute a transfer in technical language of the agreement, the employment of the last-quoted words is most peculiar. Such an intent might perhaps have been manifested by elimination of the last-quoted words and the words ''in and to'' immediately following thereafter so that the language would have been ''I hereby assign . . . unto Frederick E. Hoar the agreement, etc.'' It might then have been contended with more hope of success that the language indicated an intent merely to transfer the agreement itself. The employment of the verbiage ''all of my right, title and interest'' is inconsistent with such an intent. The phraseology is unnecessary and from a legal viewpoint meaningless. Legally there is no such thing as ''right, title, and interest'' in a document of such character as that now under consideration. The document itself was no more than a written memorial of the agreement entered into between the parties. Except for affording convenient, necessary, and proper evidence of the contract the document itself had no intrinsic value and it is incongruous to speak of Colberg having ''title'' to it or of his having a right or interest in it. Such expressions are not used with reference to a paper of this character. Finally, it must be observed that evidence was produced which showed that Colberg, in executing the instrument of August 8, 1929, intended to and thought that he had assigned and transferred to Hoar all title and interest that he had in the five claims.

Appellants further contend that if it be concluded, as we do, that the trial court's construction of the instrument of August 8, 1929, is correct and that it amounted to an assignment by Colberg of whatever right, title or interest he had acquired or derived under and by virtue of the terms of the agreement of May 28, 1928, such assignment nevertheless did not and could not operate as a transfer of any right or title or interest in the mining claims. The argument pre-

sented in connection with this contention is that the agreement of May 28, 1928, is a trust agreement which because of the fact it was reduced to written form could have been enforced by Colberg as an express trust but that Colberg's assignment of his interest in the agreement being unaccompanied by any conveyance of his interest in the property itself could not operate to transfer the right to enforce the trust of which Colberg was a beneficiary. It is apparent that the fundamental premise upon which this line of reasoning is based is that Colberg acquired no title or interest in the mining claims under the agreement of May 28, 1928, which he did not have at the time the agreement was executed. In this connection it is declared that the only right or benefit with respect to the property which Colberg actually secured under the agreement was the right to demand a deed conveying to him the legal title to an undivided half interest in the five claims upon payment by him of one-half of the money expended by C. C. Moore in procuring the issuance of a patent. The agreement, it is said, therefore, gave him no real interest or right in the property. He had the equitable title to an undivided half interest in the property which the agreement simply recognized making it clear that C. L. Moore, the record owner, was in reality the holder of the bare legal title merely as trustee for a specified purpose.

The contention that Colberg actually acquired no right, title or interest in the property through the execution of the agreement of May 28, 1928, has heretofore received adequate consideration and the conclusion reached with reference to it is sufficient to demonstrate the incorrectness of the basic premise above stated. A number of authorities are cited by appellants wherein the general principle is announced that it is essential for a party complaining in equity to have some substantial interest in the subject-matter of the suit to entitle him to equitable relief. It may be conceded that, if in fact Colberg acquired nothing more under the trust agreement than the right to have a conveyance of the bare legal title upon performance by him of the stipulated condition precedent, his bare assignment of all the right, title and interest which he had under the trust agreement would not entitle his assignee to the equitable relief demanded. This is obviously true because a court of equity upon discovering that the entire equitable title in the property existed apart

from the trust agreement and was unaffected by it would withhold its aid in the enforcement of the only right which, it is said, is provided by the agreement. It is indeed obvious that if it must be declared that Colberg acquired no greater interest in the property than the right above mentioned, respondents as successors of Colberg's assignee, Hoar, are, in any event, restricted to such right and irrespective of whether or not they may successfully invoke the aid of equity to enforce it, they are not interested in so useless a conclusion. The transfer to respondents of nothing more than the naked legal title to an undivided half interest in the property is not of any practical value. Respondents assert that they are entitled, by virtue of the assignment to Hoar, to whatever title or interest Colberg had in the property at the time the assignment was made. The court so construed the assignment and in our opinion acted properly in so doing.

Appellants particularly complain of the trial court's finding that at the time the assignment from Colberg to Hoar was made the relation of attorney and client did not exist between the two, that the assignment was supported by adequate consideration, that the transaction was fair, just and equitable and did not operate to the disadvantage or damage of Colberg. The ground of complaint in this connection is the familiar one of evidentiary insufficiency. It may properly be noted with regard to the contention thus advanced that Frederick E. Hoar testified that the sole consideration for the assignment was an unpaid balance of between two hundred and three hundred dollars due him for professional services rendered in Colberg's behalf prior to the date of the assignment. This witness also testified that he suggested to Colberg that the latter should give him an assignment of his interest in the agreement of May 28, 1928, for the attorney's fees which had accumulated, that Colberg assented, that the witness prepared the instrument of assignment, that Colberg consulted with no other person with reference to making the assignment and it was not suggested to him by the witness that he should seek independent advice prior to executing the assignment. Since it also appeared that prior to the institution of the present action the five mining claims were sold for an amount of approximately $200,000 it is apparent that the question of whether or not the relation of attorney

and client existed between the two men on the date of the assignment was one of considerable importance.

It is firmly established that transactions between attorney and client are presumptively invalid (Civ. Code, sec. 2235; *Metropolis Trust & Sav. Bank* v. *Monnier,* 169 Cal. 592 [147 Pac. 265]; *Clark* v. *Millsap,* 197 Cal. 765, 783 [242 Pac. 918]; *Estate of Witt,* 198 Cal. 407, 419 [245 Pac. 197]; *Carlson* v. *Lantz,* 208 Cal. 134, 138 [280 Pac. 531]) and that the burden rests upon the attorney to show that the transaction between him and his client was fair and equitable and no advantage was taken by the attorney and that the client was fully informed as to all matters relating to the transaction and was placed in a position to act understandingly and to deal with the attorney at arm's length. (*Magee* v. *Brenneman,* 188 Cal. 562, 567 [206 Pac. 37]; *Thornley* v. *Jones,* 96 Cal. App. 219, 227 [274 Pac. 93]; *Brydonjack* v. *Rieck,* 5 Cal. App. (2d) 219, 223 [42 Pac. (2d) 336].)

However, it must be conceded that upon appellants rested the burden of showing that at the time the assignment was made the relation of attorney and client existed between Hoar and Colberg. The assignment was valid on its face and imported the existence of sufficient consideration to support it. Respondents, as Hoar's assignees and successors in interest, were required to do no more than show Colberg's execution of the assignment to Hoar and the transfer of the assignment by Hoar to them. Upon establishing these facts a *prima facie* case in their behalf was made out. Appellants, in order to avoid the effect of the apparently valid assignment from Colberg to Hoar, asserted that at the time it was made the fiduciary relationship of attorney and client existed between the two parties to the assignment from which the presumption of invalidity would attach to the assignment. If appellants had succeeded in their effort to prove the existence of the relationship the burden of showing that the assignment was fair and equitable and that Hoar secured no advantage by reason of its execution would have rested upon respondents.

In support of their contention of evidentiary insufficiency to sustain the finding negativing the existence of the relationship of attorney and client, appellants rely particularly upon the testimony of Frederick E. Hoar and the witnesses, O'Donnell and Whitmore. The record shows that

Hoar was called by the intervener, who is not a party to this appeal, as a witness under section 2055 of the Code of Civil Procedure and that counsel for appellants then stated that his testimony might be introduced "as also coming from the cross complainants" who are the appellants on this appeal. We deem it unnecessary to encumber this opinion with any extended reference to the testimony of the two witnesses other than Frederick E. Hoar. It may, however, be remarked in passing that the testimony of those witnesses upon which particular reliance is placed by appellants on the phase of the case now under consideration related to the time when they testified that in company with Colberg they called at the office of Hoar. These witnesses stated that the visit occurred at some time during the month of July or in the latter part of August or in the month of September, 1929, at which time Hoar said that he had no interest in the mining claims, that he was Colberg's attorney and was protecting Colberg's interest in the property. The date of the alleged visit in conjunction with the claimed admission of Hoar manifestly had a bearing on the question of whether or not the relationship of attorney and client existed between Hoar and Colberg at the time the assignment was executed. If the alleged visit occurred subsequent to the date of the assignment there was evidence that Hoar made the admission against interest to which reference has been made at a time when it is now claimed he had succeeded to all of Colberg's interest in the property and had ceased to be Colberg's attorney. The witness Whitmore testified that the visit probably occurred in 1930 either in the month of July or August, that the date of the visit was a long time before Colberg's death and that long afterward Colberg was sent to the hospital. The witness, Jack O'Donnell, was more definite as to the date of the alleged visit and stated that it occurred during the latter part of August or early in September, 1929. The witness Frederick E. Hoar testified that he did not remember any occasion when Colberg, Whitmore and O'Donnell together called upon him. On this state of the evidence appellants urge that it was conclusively established that Hoar admitted he was Colberg's attorney after the assignment was executed. Analysis of the testimony of the witnesses Whitmore and O'Donnell fails, however, to produce such con-

viction of certainty respecting the date of the alleged visit to Hoar's office that a declaration of absolute proof is warranted. Whitmore, so far as appears, was a disinterested witness but his testimony regarding the date was vague and indefinite. O'Donnell's testimony on the point was much more definite as he fixed the date during the latter part of August or early in September, 1929. However, it must not be overlooked that O'Donnell was very materially interested in the outcome of the action in which he testified. He was a party to the suit and is the husband of appellant, Mary A. O'Donnell, who, as one of the two beneficiaries named in the will of Gus Colberg, is most vitally interested in the final disposition of the present litigation. This fact is here mentioned since it is an important element which the trial judge was entitled to take unto consideration in appraising the credibility of witnesses and assessing the weight of evidence. This fact alone without reference to the poor quality of the testimony of a witness plainly interested in the outcome of the trial may well have impelled the trier of facts to reject the testimony of the witness as to the date of the alleged visit.

Upon the question of whether or not the relation of attorney and client existed on the date of the assignment the only direct evidence produced consisted of the testimony of Frederick E. Hoar. Appellants place very considerable reliance on portions of the testimony given by this witness and attack his statement that he was not Colberg's attorney on August 8, 1929, on the ground that it was a pure conclusion contrary to other testimony educed from the witness. No useful purpose would be served by indulging in a protracted analysis of the evidence now under consideration. Careful reading of Hoar's testimony impels the admission that, presented in the form of cold type, it is far from satisfactory. Nevertheless, it may not be declared that the evidence established the fact—highly important to appellants— of the existence of the relationship of attorney and client on the date the assignment was made. The trial judge had the opportunity of hearing Hoar's testimony at first hand and of observing the manner in which the witness testified. It was the trial court's responsibility to determine the weight which should be given his testimony and the credit to which it was entitled. Evidently the court accepted the statement

of the witness that the relationship did not exist on August 8, 1929. It must be conceded that the court was entitled so to do. It may not therefore be declared, as appellants contend, that the finding negativing the existence of the fiduciary relationship on the date mentioned is so lacking in evidentiary support that it must be set aside.

The final contention advanced by appellants is that the issues of adverse possession and the bar of the statute of limitations against the claims of respondents in the property were raised by implied replication to the answer filed by respondents to appellants' cross-complaint, that evidence bearing on these issues was produced during the trial of the action, and that consequently the trial court erred in failing to make findings upon such issues which findings if made would necessarily have been favorable to appellants. It is evident from a reading of the record herein that the case was tried upon the theory that the above-mentioned issues were before the court by virtue of the provisions of section 462 of the Code of Civil Procedure which declares that any new matter in the answer of a defendant in avoidance or constituting a defense or counterclaim must be deemed denied. It is also clear that the two issues to which reference has been made are so interrelated that a determination of the contention as to one of them will be conclusive as to both. Since it is apparent from the record that considerable evidence was received on the issue of adverse possession by appellants the contention with respect to such issue will be considered.

As we understand appellants' contention in this regard it is not merely that the trial court should have made a finding upon the issue of adverse possession but also that the only finding which would have found support in the evidence is a finding sustaining appellants' claim that they had acquired title as against respondents by adverse possession of the property.

In giving consideration to the contention thus advanced it may be remarked at the outset that since appellants were relying upon adverse possession the burden of proving all the essential elements thereof rested upon them. (1 Cal. Jur., p. 636; *Allen* v. *Allen,* 159 Cal. 197 [113 Pac. 160] ; *San Francisco Credit C. House* v. *Wells,* 196 Cal. 701, 705 [239 Pac. 319].)

Examination of the record impels the conclusion that the burden thus imposed upon appellants was not sustained by them. The five elements required to make out an adverse possession are: first, possession by actual occupation, open and notorious; second, a possession hostile to the true owner's title; third, a possession held under claim of title, exclusive of any other right; fourth, a possession continuous and uninterrupted for a period of five years prior to the assertion of the claim; fifth, it must appear that the claimant has paid all taxes levied or assessed upon the land during the period of his possession (1 Cal. Jur., p. 522). The evidence produced by appellants failed to sustain certain of these elements necessary to successfully establish the defense of adverse possession. As appellants failed to sustain the burden which the law placed upon them of establishing each element of an affirmative defense upon which they relied, it is obvious that had the trial court found on this question such finding of necessity would have been against them and their contention. When a finding, if made, of necessity would have been against appellants they cannot complain of the lack of such finding. (*Consolidated Irr. Dist.* v. *Crawshaw,* 130 Cal. App. 455 [20 Pac. (2d) 119]; 24 Cal. Jur. 944; 10 Cal. Jur. Ten-year Supp., p. 740 and cases cited.)

The judgment is affirmed.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1938.